UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MICHAEL J. PULIZOTTO,

                                Plaintiff,                          17-cv-9726 (PKC)

              -against-                                              OPINION
                                                                    AND ORDER

JUDITH N. MCMAHON et al.,

                                Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

              Michael J. Pulizotto alleges that, while working as Chief Clerk of the New York

Supreme Court in Staten Island, he was harassed and threatened for being gay and for reporting

evidence of misconduct by various court officials.  Pulizotto remains employed by the New York

courts but has been transferred to a different location with diminished responsibilities.

              He brings this action against Judith N. McMahon, Justice of the New York

Supreme Court, Richmond County, George J. Silver, Justice of the Supreme Court, New York

County and Deputy Chief Administrative Judge for All Courts Within New York City ("DCAJ"),

the New York State Court Officers' Association ("NYSCOA") and several of its members, the

Executive Director and Chief of Administration of the New York State Office of Court

Administration, and the Chief of Department of Public Safety for the New York State Unified

Court System ("NYSUCS"), asserting claims under 42 U.S.C. §§ 1983, 1985, and New York

State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296(1) et seq. The 386-paragraph

Complaint contains many criticisms of the administration of the judicial system in Staten Island

during the tenure of defendant McMahon as Administrative Judge; some are material to the claims for relief and others are not.

Defendants McMahon, the NYSCOA, and two court officers and members of NYSCOA, Ted Kantor and Stephen Mikos, now move to dismiss plaintiff's Third Amended Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P. For reasons that will be explained, the motions will be granted in part and denied in part.

BACKGROUND

The following facts are taken from Pulizotto's Third Amended Complaint and exhibits referenced therein and are accepted as true for purposes of the motion. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). Plaintiff alleges two separate types of harassment and threats – those related to his disclosure of McMahon's alleged misconduct, and those related to his self-identification as a gay male.

     i.     Harassment Related to Pulizotto's Disclosure of Misconduct

McMahon held the position of Administrate Judge for Richmond County making her "the highest-ranking judge in the county with administrative judicial supervisory authority over other judges and justices." (Compl. ¶38.) McMahon's husband became a candidate for District Attorney of Richmond County and as of May 2015, McMahon was under "written and verbal directives" to refrain from exercising authority over criminal matters. (Compl. ¶¶ 4(a), 39-41.) Honorable Justice Stephen Rooney was designated Acting Administrative Judge for criminal matters. (Id. ¶42.)

On July 10, 2015 Pulizotto, during McMahon's tenure as Administrative Judge, was appointed Chief Clerk of the Richmond County Supreme Court. (Id. ¶50.) Almost immediately thereafter, Pulizotto began to note McMahon's involvement in criminal matters.

For example, on July 16, Pulizotto discussed criminal procedure issues with Justice Rooney and that same day, McMahon "screamed at and berated" Pulizotto for offering his opinions to Justice Rooney, telling him "You're on probation!" and "We don't send things out-of-county!" (Id. ¶¶51-52.) McMahon continued to work on criminal matters throughout the summer of 2015. (Id. ¶¶53-57; see id. ¶¶67-68.)

On September 4, 2015, Pulizotto met with the Executive Director of the NYSUCS, Ronald P. Younkins. (Id. ¶84.) At that meeting Pulizotto reported McMahon's interference in criminal matters and other alleged misconduct, including threats made against him for speaking to the Inspector General of the NYSUCS ("IG") regarding a possible investigation into a workplace harassment complaint of another employee. (Id.)[1]

On November 30, 2015, Pulizotto met with Dennis W. Quirk, President of the NYSCOA (Id. ¶¶5, 94.)[2] At that meeting, Quirk told Pulizotto he was "halfway out the door" regarding his employment, that he should "shut up and do as [he] is told," that McMahon "knew [he was] coming here," and he asked Pulizotto "Who are you to say that [Justice McMahon] should leave Richmond County for ethical reasons?" (Id. ¶95.) At the meeting Quirk "falsely asserted that Pulizotto was seeking sexual favors from male officers in the locker room" and told him there were rumors he was involved with another male court officer. (Id. ¶96.) After that meeting on the same day, McMahon allegedly called Pulizotto to her office, "rolled her eyes," and asked him "Do you understand?" (Id. ¶98.)

---

[1] Denise Marangos, a law clerk, claimed that a senior clerk created a hostile work environment at the court by mocking her weight and health. (Compl. ¶¶70-71.) Pulizotto spoke to the IG about her complaint. (Id. ¶74.) McMahon admonished Pulizotto for his actions, stating: "I decide if we go to the I.G.," "This is a loyalty issue," "We don't go out of county," "We won't work together if this happens again," and "I have serious doubts about us being able to work together." (Id. ¶79.)

[2] The NYSCOA is "an unincorporated association existing under the laws of the State of New York." (Compl. ¶28.)

Justice McMahon's work on criminal matters continued through December 2015 and January 2016. For example, she directed Pulizotto not to implement a bail reform program (id. ¶¶99, 101), discussed budgetary priorities for the criminal term with the budget office (id. ¶¶102-03), told Pulizotto she would handle a media request related to a criminal matter, (id. ¶¶105-07) and acted with respect to a request by the Richmond County District Attorney's office to keep a courthouse open after hours, (id. ¶¶108-11; see id. ¶113.) Throughout the summer of 2016 and spring of 2017 Pulizotto recorded further instances of McMahon getting involved in, attempting to get involved in, or expressing interest in criminal matters. (E.g., id. ¶¶130-31, 134-36, 139, 142, 150, 153-54, 157, 160-61, 177-78.) These included forming a Narcotics Part of the Criminal Court, choosing which justice to assign as presiding judge of the Narcotics Part, diverting staffing and security to the hand-picked presiding justice, and coordinating with her husband to have cases sent to the hand-picked justice. (Id. ¶¶162-66.) Throughout the spring and early summer of 2017 Pulizotto alleges McMahon engaged in similar conduct and additional conduct on non-criminal matters that raised questions as to her impartiality and fitness as a judicial officer. (Id. ¶¶185-92; 199-200.)

Pulizotto also details other instances where McMahon attempted to suppress investigations into alleged courthouse misconduct. In February 2016, a court officer identified as SV complained to Pulizotto about race and gender discrimination by her supervisor. (Id. ¶117.) Pulizotto informed McMahon, who directed Pulizotto to wait before taking any action on the discrimination complaint until another judge was reappointed to her position, an event that would not occur for approximately twelve months. (Id. ¶¶120-21.) In July 2016, SV also reiterated that she was called a racist name at a holiday party in December 2013 by one of the

girlfriends of a court employee, Steven Panella. (Id. ¶141.) That incident was never investigated. (Id. ¶¶64-65.)

In March 2017 Pulizotto submitted a report complaining of McMahon's conduct to the DCAJ,[3] the United States Attorney for the Southern District of New York, and the IG. (Id. ¶¶179-80.) Pulizotto provided audio recordings of alleged misconduct to the IG. (Id. ¶183.) At some point McMahon received a copy of the report. (Id. ¶181.) Pulizotto reported further allegations of McMahon's misconduct related to interference in criminal matters to the IG in August 2017. (Id. ¶207.) McMahon met with the IG regarding these allegations on August 7, 2017 and told Pulizotto that she "did nothing wrong and would be vindicated." (Id. ¶210; Doc 14 (First Am. Compl.) Ex. 2.) On August 18, Justice Silver and others called Pulizotto and told him to report any retaliatory actions he experienced. (Id. ¶213.) Pulizotto believes the calls were made because the IG disclosed to McMahon his identity as a whistleblower (Id. ¶216.)

At the end of August 2017, Pulizotto reported to the DCAJ allegations that Quirk berated and harassed Pulizotto for decisions related to court officer staffing (Id. ¶220; Doc 14 Ex. 3.)

On September 5, 2017, Pulizotto arrived at the courthouse to find a "mob" consisting of Quirk, Mikos, Kantor, and other court officers (Id. ¶230.) The officers "other than Quirk, Mikos and Kantor" were "in uniform and on-duty." (Id.) The group "curse[d] at and threaten[ed]" Pulizotto, including making threats to harass his father at his father's nursing home and revoke Pulizotto's membership in the Fraternal Order of Police. (Id. ¶231.) Quirk was

---

[3] The DCAJ in March 2017 was Judge Fern Fisher. (Compl. ¶179.) She was replaced upon her retirement in May 2017 by Justice Silver, a non-moving party in this dispute (Id. ¶193.)

"telling everyone who passes by" that Pulizotto was a "rat who went to the IG and had people on tape," (Doc 14 Exs. 4, 5; see Compl. ¶233-34), and "loudly and publicly screamed" at another court officer walking into the building a homophobic remark that referenced the officer performing sexual acts on Pulizotto. (Id. ¶232.)

That same day, McMahon called an emergency judges meeting at the courthouse during which she "[a]nnounced the allegations against her," accused Pulizotto of recording members of the court, stated she would be vindicated, and solicited and received a vote of "no confidence" in Pulizotto. (Id. ¶239.)

On September 7, Quirk "blockad[ed]" the entrance to the courthouse driveway, "screamed and cursed at" Pulizotto, and "publicly threatened" to come to his house. (Id. ¶¶255-57, 260; Doc 14 Ex. 7.) Quirk, Mikos, and Kantor inflated a giant rat bearing Pulizotto's name in the courthouse driveway and made statements to the media while displaying the rat. (Compl. ¶¶259, 263(d).)

The afternoon of September 7 Pulizotto was informed by Younkins that he was being transferred out of Richmond County and Younkins referenced the judges' "no confidence" vote. (Id. ¶269.) Pulizotto was transferred to a different office effective September 11, 2017 where he was assigned no supervisory duties. (Id. ¶¶273, 275.)

ii.    Harassment Related to Pulizotto's Sexual Orientation

Pulizotto alleges various instances of harassment based on his sexual orientation. For example, he alleges that McMahon mocked him by speaking to him in an exaggerated, effeminate tone while using homophobic hand gestures at a dinner attended by court staff in February 2016. (Id. ¶124.) She required him to bring her coffee, a task not within his job

description, and that demand, he alleges, was motivated by animus based upon his sexual orientation. (Id. ¶¶125-27.)

LEGAL STANDARD

Rule 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In assessing the sufficiency of a pleading, a court must disregard legal conclusions, which are not entitled to the presumption of truth. Id. Instead, the Court must examine the well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679. "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

DISCUSSION

I.    McMahon's Motion to Dismiss

Although the Complaint states Pulizotto is suing McMahon individually and in her official capacity as an Administrative Judge (Compl. ¶19), in his opposition to the motion Pulizotto abandons that allegation and asserts that he is suing her solely in her individual capacity. (Opp. Br. at 19; Doc 83.) The Court considers claims against McMahon exclusively in her individual capacity.

A.    First Amendment Retaliation Claims (Claims 1, 2, 4, 8)

Pulizotto alleges in claims 1, 2, 4, and 8, all brought under 42 U.S.C. § 1983, that McMahon violated his right to petition the government for redress and express his beliefs and

political affiliations following his reports of misconduct to the United States Attorney for the Southern District of New York and the IG. (Compl. ¶¶283, 291, 308, 311.) He primarily alleges McMahon retaliated against him in the form of harassment outside of the courthouse on September 5 and 7, 2017, and his transfer from his position as Chief Clerk to a position with diminished responsibilities. (Id. ¶¶282, 284-85, 292, 310, 347, 350, 352.)

To state a First Amendment retaliation claim sufficient to withstand a motion to dismiss, plaintiff must allege 1) "his [or her] speech or conduct was protected by the First Amendment;" 2) "the defendant took an adverse action against him [or her];" and 3) "a causal connection between this adverse action and the protected speech. Montero v. City of Yonkers, New York, 890 F.3d 386, 394 (2d Cir. 2018) (quoting Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011)).

1. Protected Speech or Conduct

McMahon argues that Pulizotto's disclosures to the IG and United States Attorney's Office do not plausibly qualify as protected speech or conduct. To engage in protected speech under the First Amendment, an employee must speak as a citizen on a matter of public concern. Garcetti v. Ceballos, 547 U.S. 410, 417-18 (2006). There is no dispute that the allegations of misconduct reported by Pulizotto are matters of public concern. See id. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."). If a court determines an individual speaks as a citizen on a matter of public concern, "[t]he question becomes whether the relevant government entity had an adequate

justification for treating the employee differently from any other member of the general public." Id. at 418.[4]

The Second Circuit has identified two relevant inquiries to determine whether a public employee speaks as a citizen: 1) "whether the speech falls outside of the employee's official responsibilities;" and 2) "whether a civilian analogue exists." Montero, 890 F.3d at 397 (internal quotation marks, citation, and alterations omitted). Whether an employee is speaking pursuant to official duties is "not susceptible to a brightline rule" and requires examination of "the nature of the plaintiff's job responsibilities, the nature of the speech," the "relationship between the two," and "[o]ther contextual factors, such as whether the complaint was also conveyed to the public." Ross v. Breslin, 693 F.3d 300, 306 (2d Cir. 2012); see Taylor v. New York City Dep't of Educ., 11 cv 7833 (AJN), 2012 WL 3890599, at *2 (S.D.N.Y. Sept. 6, 2012) (stating that "[t]he inquiry is a practical one" and "because the inquiry is fact-bound, courts sometimes defer resolution of this question because the record is not sufficiently developed") (quotations omitted)). Speech has a civilian analogue if "made through channels available to citizens generally." Matthews v. City of New York, 779 F.3d 167, 175 (2d Cir. 2015) (quotations omitted). "[A]n indicium" of an analogue "is that the employee's speech was to an independent state agency responsible for entertaining complaints by any citizen . . . ." Id. (internal quotation marks and citations omitted).

Pulizotto has plausibly alleged that his complaints to the United States Attorney and the IG were protected speech as a citizen. "The rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment." Gagliardi v. Vill. of Pawling, 18 F.3d 188, 194 (2d Cir. 1994). The nature of reporting ethical misconduct within

---

[4] The parties do not brief the second prong of the prohibited speech test.

the judiciary as a "right to petition for a redress or grievances" is "among the most precious of the liberties safeguarded by the Bill of Rights." United Mine Workers v. Ill. State Bar Ass'n, 389 U.S. 217, 222 (1967). As the Supreme Court has stated, "[i]t would be antithetical" to conclude that "the very kind of speech necessary to prosecute corruption by public officials – speech by public employees regarding information learned through their employment – may never form the basis for a First Amendment retaliation claim." Lane v. Franks, 573 U.S. 228, 240-41 (2014); see Taylor, 2012 WL 3890599, at *7 ("[R]eporting fraud, corruption, or criminal behavior" is generally distinguished from speech directed at the performance of an individual's job duties.).

The Complaint does not state facts showing as a matter of law that reporting ethical violations to an IG or United States Attorney's Office were the "regular duties" of Chief Clerk of the Richmond Supreme Court. Matthews, 779 F.3d at 173. McMahon argues that Pulizotto admitted his disclosure to the IG was made in the course of his employment responsibilities because the Complaint states that Pulizotto reported "as a citizen, attorney and court administrator." (Compl. ¶291 (emphasis added)). Viewing all the allegations in a light most favorable to Pulizotto, this statement without more does not admit that reporting to the IG was "part-and-parcel of [Pulizotto's] ability to execute his official duties" as Chief Clerk. Montero, 890 F.3d at 396 (quotations omitted). Moreover, contrary to McMahon's argument, communicating a complaint of misconduct to the public, rather than in private, is but one of the "contextual factors" in a Court's determination. Ross, 693 F.3d at 306.

It is plausible to infer that Pulizotto's speech had a civilian analogue. Complaints to "inspector general[s]" and those "sent to an outside entity" like the United States Attorney's

Office are channels "available to non-employee citizens." <u>Weintraub v. Bd. of Educ. of City School Dist. of City of New York</u>, 593 F.3d 196, 204 (2d Cir. 2010) (citation omitted).

McMahon argues Pulizotto's speech does not fall outside of his employee responsibilities and does not have a civilian analogue because his speech was based on secret audio recordings that he was able to take based on his status as Chief Clerk. The Complaint contains no allegation that Pulizotto made audio recordings as part of his job responsibilities. It is not "determinative" that his remarks "touched on matters that he learned through the course of his employment." <u>Montero</u>, 890 F.3d at 398 (citing <u>Lane</u>, 573 U.S. at 239). Pulizotto has plausibly alleged that his reports of McMahon's conduct were protected speech under the First Amendment.

### 2. Adverse Action

Adverse action in the context of a First Amendment retaliation claim is "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." <u>Zelnik v. Fashion Inst. of Tech.</u>, 464 F.3d 217, 225 (2d Cir. 2006) (quotations omitted). A non-exhaustive list of adverse actions "include[s] discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," but the determination is generally "a heavily fact-specific, contextual" one. <u>Id.</u> at 226 (quotations omitted); <u>see Raymond v. City of New York</u>, 317 F. Supp. 3d 746, 773 (S.D.N.Y. 2018). This Court concludes that Pulizotto's job transfer and the parking lot harassment by court officers may potentially amount to retaliatory adverse action.

In his Opposition Brief, Pulizotto suggests that McMahon took other adverse employment actions against him. He alleges he was not allowed a day off and was not allowed to attend a meeting he otherwise would have attended eleven days after he met with Younkins to

discuss McMahon's misconduct including but not limited to her suppression of Marangos's complaint in September 2015. (Compl. ¶¶84, 89, 92.) Pulizotto makes no allegation that McMahon learned of his reporting to Younkins and, in any event, reporting to Younkins is not an avenue available to non-employee citizens to qualify as protected speech. Weintraub, 593 F.3d at 204. To the extent Pulizotto separately argues he suffered an adverse employment action when McMahon stopped telephoning him numerous times per day on "days, nights and weekends" and summoning him to her chamber following her meeting with the IG in August 2017 (Compl. ¶¶209-10, 216), it is not plausible to infer from the Complaint that this conduct rises to the level of "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Zelnik, 464 F.3d at 225.

McMahon argues that the Complaint does not assert that she had personal involvement in the adverse actions. "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. . . . [A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676; see Provost v. City of Newburgh, 262 F.3d 146, 154 (2d Cir. 2001) ("[I]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." (internal quotation marks and citation omitted)). Personal involvement of a supervisory defendant may be alleged by showing a defendant "personally participated in the alleged constitutional violation," "was grossly negligent in supervising subordinates who committed the wrongful acts," or "exhibited deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were

occurring." Provost, 262 F.3d at 154 (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).

        i.      Pulizotto's Job Transfer (Claim 4)

        The Complaint plausibly alleges McMahon's personal involvement in Pulizotto's transfer to a job with diminished responsibilities. McMahon called an emergency meeting on September 5, 2017 at which she told all judges about the allegations against her, accused Pulizotto of having "thousands of hours of recordings on everyone," solicited and received a vote of "no confidence" in Pulizotto, and said she would be vindicated. (Compl. ¶239.) On at least one prior occasion when Pulizotto spoke with the IG about unrelated allegations of misconduct, McMahon threatened Pulizotto's employment by stating "We won't work together if this happens again" and "I have serious doubts about us being able to work together." (Id. ¶¶74, 79.) Two days after the emergency meeting of judges, Pulizotto was informed by supervisors that he was going to be transferred and at that meeting the supervisors referenced the September 5, 2017 "no confidence" vote. (Id. ¶269.) The Complaint alleges that Pulizotto was transferred "at the specific request from" McMahon or to fulfill her desire to retaliate against him. (Id. ¶277.) This is sufficient for the claim to survive a motion to dismiss.[5] Provost, 262 F.3d at 154.

        ii.     Pulizotto's Parking Lot Harassment (Claims 1, 2)

        By contrast, the Complaint does not plausibly allege McMahon's involvement with respect to Pulizotto's harassment outside of the courthouse on September 5 and 7, 2017. The Complaint summarily states that McMahon and others "affirmatively and passively

---

[5] In her Motion to Dismiss, McMahon alleges she could not have been responsible for Pulizotto's transfer based on facts that are immaterial or not found in the Complaint. (See, e.g., Opp. Br. at 24; Doc 77 (arguing other judges voted they had no confidence in Pulizotto and that McMahon had been transferred out of her position in Richmond County to a different role by September 6, 2017).) The Court will not consider matters outside the pleadings on a motion to dismiss. Nakahata v. New York-Presbyterian Healthcare Sys., Inc., 723 F.3d 192, 202-03 (2d Cir. 2013).

permitt[ed]" Quirk and other NYSCOA members to harass Pulizotto and seize his property in the parking lot and "communicated" to them "that they will not be arrested, punished, or otherwise interfered with," (Compl. ¶¶284-85, 292-93), but it offers no factual allegations to support these theories as to McMahon. Pulizotto argues in his Opposition Brief that McMahon may be liable under theories of deliberate indifference and gross negligence in supervision. The Complaint makes no allegation that McMahon supervised anyone allegedly involved in the harassment outside of the courthouse or that McMahon had any knowledge of the September 5 or September 7 actions to give rise to plausible theories of negligent supervision or deliberate indifference. (See Colon, 58 F.3d at 873; Compl. ¶¶38, 348 (stating McMahon supervised other judges, justices, and Pulizotto).) At most the Complaint alleges that "[a]s a judicial supervisor, Justice McMahon intentionally permitted Quirk and his accomplices to openly and publicly intimidate, retaliate and threaten Pulizotto and others at the courthouse on September 5, 2017 and September 7, 2017." (Compl. ¶243.) These conclusory allegations do not plausibly allege actionable participation or deliberate indifference by McMahon.

The Complaint also states that McMahon acted "in concert with . . . others" to commit First Amendment retaliation under section 1983 based on the September 5 and 7 parking lot harassment. (Compl. ¶¶282, 290.) In his opposition papers, Pulizotto asserts that there was a civil conspiracy between McMahon and Quirk. (Opp. Br. at 27; Doc 83 (quoting Ciambriello v. Cty. of Nassau, 292 F.3d 307 (2d Cir. 2002).) McMahon argues in both her memorandum of law and reply that Pulizotto has not pleaded a section 1983 conspiracy. (Mem. in Support of Mot. to Dismiss at 13-14; Doc 77; Reply Br. at 5-7; Doc 84 (discussing Ciambriello).) Although the Complaint does not use the term conspiracy in claims 1 or 2, the Court will consider this theory. See Marbury Mgmt., Inc. v. Kohn, 629 F.3d 705, 712 n.4 (2d Cir. 1980) ("Generally a complaint

that gives full notice of the circumstances giving rise to the plaintiff's claim for relief need not also correctly plead the legal theory or theories . . . supporting the claim.").

The interrelationship between section 1983's requirement of personal involvement on the part of the state actor and the availability of a conspiracy theory to support liability for the state actor is not well explored in the case law. Here, it is the actions of a non-state actor, Quirk, on which the liability of the state actor, McMahon, is in part based. Provost, a non-conspiracy case, notes that the requirement of personal participation "does not foreclose the liability of a person who, with knowledge of the illegality, participates in bringing about a violation of the victim's rights but does so in a manner that might be said to be 'indirect,'" such as by "ordering or helping others to do the unlawful acts." 262 F.3d at 155. This Court concludes that for section 1983 liability the actions of the co-conspirator imputed to the state actor must be more than merely foreseeable to the state actor. Cf. United States v. Joyner, 201 F.3d 61, 70 (2d Cir. 2000) (stating defendant in criminal conspiracy may be "liable as a conspirator for the[] reasonably foreseeable crimes of his coconspirators"). The state actor must have directed, ordered, importuned, assisted or have been deliberately indifferent to or recklessly permitted the wrongful actions. Put another way, a state actor may be liable on a conspiracy theory but her actions must also satisfy the Iqbal and Provost standards.

"In order to survive a motion to dismiss on [a section] 1983 conspiracy claim, [plaintiff] must allege (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Ciambriello, 292 F.3d at 324-25 (2d Cir. 2002); see Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970) (finding section 1983 could provide liability for a private party

who "is a willful participant in joint activity with the State or its agents" (quotation omitted)).[6] While "conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence," Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999), plaintiff must still allege facts beyond "conclusory, vague, or general allegations" to assert the existence of an agreement to inflict constitutional injury, Ciambriello, 292 F.3d at 324-25.

The Complaint does not contain facts that plausibly give rise to a claim for a section 1983 conspiracy between McMahon and Quirk. The allegations with respect to McMahon and Quirk's conspiracy are as follows: (1) in November 2015, nearly two years before the alleged parking lot incidents, Quirk berated Pulizotto about his complaints to the Executive Director of the New York State Office of Court Administration related to McMahon, stated McMahon "knew [he was] coming" to meet with Quirk and that Pulizotto was "halfway out the door" and should "do as [he was] told," and McMahon later that day "rolled her eyes" and in an "angry tone" asked Pulizotto "Do you understand?" (Compl. ¶¶95, 98); (2) between September 5 and December 2017 (after the parking lot incidents), McMahon and Quirk made unspecified statements to the media and McMahon's statements accused Pulizotto of "being part of a political plot against the McMahons" (id. ¶276); and (3) McMahon and Quirk had "close personal and political ties" and a "penchant and reputation for volatility and retribution against perceived enemies" (id. ¶218.) The Complaint additionally offers the conclusory statement referred to above that "McMahon intentionally permitted Quirk and his accomplices to openly

---

[6] Pulizotto makes no argument that Quirk was acting as a state actor during the conspiracy. See Biswas v. City of New York, 973 F. Supp. 2d 504, 533 (S.D.N.Y. 2013) (section 1983 conspiracy may be alleged between two or more state actors); Opp. Br. at 20; Doc 83 (alleging conspiracy between state actor and private party).

and publicly intimidate, retaliate and threaten Pulizotto and others at the courthouse on September 5, 2017 and September 7, 2017."  (Id. ¶243.)

On a generous reading of the complaint, the only circumstance alleged that suggests any "meeting of the minds" between Quirk and McMahon occurred two years before the parking lot incidents.  Adickes, 398 U.S. at 158.  This was in November 2015 when Quirk threatened Pulizotto that his employment was tenuous based on his disclosures and told him to do as he was told, and McMahon asked Pulizotto upon return to his office "Do you understand?" (Compl. ¶¶95, 98.)  Particularly in view of Pulizotto's continued status as Chief Clerk, these events are too remote in time to support without more a plausible allegation that the parking lot harassment was the product of a conspiracy that included Quirk and McMahon.

The Complaint alleges a plausible, direct and immediate reason for non-party Quirk's inappropriate and hostile actions towards Pulizotto.  On August 29, four business days before the parking lot harassment, Pulizotto alleges that he telephoned George Magliano, the state's highest-ranking uniformed Court Officer and a supervisor of Quirk's, and informed him that Quirk was acting in a hostile and insubordinate manner towards him.  (Compl. ¶222-23.) An email of August 29, annexed to the complaint and referring to his call to Magliano, notes Quirk's complaint about what Quirk saw as Pulizotto's inappropriate use of Court Officers but no mention was made of McMahon.  (First Am. Compl. at Ex. 3; Doc 14.)  A reasonable inference from the allegations of the Complaint is that Quirk learned of this, was highly displeased and this motivated his actions on the first workday after Labor Day.  Quirk also stated in the parking lot he considered Pulizotto a "rat who went to the IG and had people on tape."  (First Am. Compl. at Ex. 4.)  This is consistent with Quirk's plausible independent motivation to harass Pulizotto

based on Pulizotto's reporting. The Complaint contains no allegation that McMahon told Quirk about the tapes or I.G. investigation.

McMahon is not alleged to have been at the courthouse parking lot on either September 5 or September 7 or to have known of the events that would take place in the parking lot. McMahon and Quirk made unspecified statements to the media between September 5 and December 2017. (Id. ¶276.) The statements are not alleged to have been made contemporaneously. There is no allegation that the statements related to a shared desire to inflict Constitutional injury in the courthouse parking lot, and the time frame of the allegation is largely after the relevant overt acts occurred. McMahon and Quirk's allegedly close personal and political ties similarly do not support a plausible claim of conspiracy. See Edwards v. Horn, 10 cv 6194 (RJS)(JLC), 2012 WL 473481, at *18 (S.D.N.Y. Mar. 8, 2012) (stating "reinforcement of [state actor's] decision to fire [plaintiff], at best, suggests only that [non-state actor] sided with" the decision), report and recommendation adopted, 2012 WL 760172 (S.D.N.Y. Mar. 8, 2012); Dunlop v. City of New York, 06 cv 0433 (RJS), 2008 WL 1970002, at *7-8 (S.D.N.Y. May 6, 2008) ("alleging merely that a private party regularly interacts with a state actor . . . does not create an inference of agreement to violate a plaintiff's rights"). Reading the Complaint in the light most favorable to Pulizotto, the Complaint fails to plausibly allege personal involvement by McMahon in the parking lot harassment on September 5 and 7, 2017.[7]

### 3. Causal Connection Between Speech and Adverse Action

McMahon argues there can be no causal connection between Pulizotto's disclosures to the United States Attorney and any adverse action because the Complaint does not

---

[7] "A Section 1983 conspiracy claim is distinct from one of joint action." Betts v. Shearman, 751 F.3d 78, 84 n.1 (2d Cir. 2014). To the extent Pulizotto separately argues a claim for joint action, it is dismissed based on the same failure to plead plausible allegations that McMahon was a "willful participant in joint activity" with Quirk. Ciambriello, 292 F.3d at 324.

allege that McMahon ever knew he went to the United States Attorney with accusations against her. At most, the Complaint states that "[o]n information and belief, Justice McMahon received a copy of Pulizotto's March 24, 2017 chronology that he provided to I.G. . . . after Pulizotto submitted it. Accordingly, Justice McMahon knew Pulizotto had reported numerous violations of the law to the United States Attorney's Office." (Compl. ¶181.)

Causation may be established by "showing that protected activity was close in time to the adverse action." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009). As the Complaint does not allege when McMahon knew of disclosures to the United States Attorney's office, the Court cannot determine if the disclosure is close in time to Pulizotto's transfer on September 7, 2017. Nevertheless, because the job transfer claim alleges disclosures to both the United States Attorney's Office and IG, and McMahon does not challenge that her knowledge of Pulizotto's reports to the IG are close in time to his transfer, claim 4, the job transfer claim, will not be dismissed.

### 4. Claim 8 – Retaliation Based on Political Affiliation

Pulizotto separately alleges in claim 8 First Amendment retaliation based on his perceived political affiliation against McMahon's husband, the District Attorney of Richmond County. The underlying acts of protected speech and adverse action are the same as those alleged in claims 1, 2, and 4. (See Compl. ¶352 (alleging in claim 8 that McMahon retaliated with a transfer and acts of intimidation after being informed of Pulizotto's allegations of her misconduct); see also id. ¶203 (alleging McMahon speculated that the reporting of her misconduct was "part of a political plot against her husband")). The only remaining allegation related to Pulizotto's negative opinion of McMahon's husband claims that McMahon and her husband between September 5 and December 2017 falsely accused Pulizotto of being part of a

"political plot" against them. (Compl. ¶276.)[8] The Court does not understand Pulizotto to be alleging that the false accusations themselves were adverse action and this singular allegation does not otherwise plead a separate First Amendment retaliation claim based on political activity.

Pulizotto relies on Heffernan v. City of Paterson, N.J., 136 S. Ct. 1412, 1417-18 (2016), which held that an individual may bring a First Amendment retaliation claim based on an employer's incorrect perception of the employee's alleged political activities. But the protected activity in Heffernan was picking up a political campaign sign, or "joining, working for or contributing to the political party and candidates." Id. at 1416-17. Here, there is no separate conduct alleged other than Pulizotto's reporting to the IG and United States Attorney's Office. The speculated motivation for that reporting, related to political affiliation, does not turn the reporting itself into a kind of political activity. The reporting has already been found to be Constitutionally-protected speech. Without any separate allegation of protected activity related to political affiliation, claim 8 will be dismissed.

### 5. McMahon's Claim for Qualified Immunity

McMahon raises a defense of qualified immunity to Pulizotto's First Amendment retaliation claims.[9] Qualified immunity requires a court to determine whether the alleged Constitutional right of plaintiff was "clearly established at the time of the violation" and whether "it was objectively reasonable [for the defendants] to believe that their acts did not violate" a clearly established right. Looney v. Black, 702 F.3d 701, 706 (2d Cir. 2012) (quotations omitted). For First Amendment retaliation, "even speech on matters of public concern is not

---

[8] The Complaint also alleges that McMahon requested Pulizotto canvass for signatures for her husband's campaign and attend a campaign fundraiser. (Compl. ¶¶47-48.) It makes no allegation that adverse action was taken as a result of Pulizotto's submission to these requests.

[9] Though argued under a header entitled "Claim One," the Court treats the qualified immunity argument as applicable to all First Amendment retaliation claims.

protected from retaliation unless the employee's First Amendment interests outweigh government employers' legitimate interests in efficient administration." Lynch v. Ackley, 811 F.3d 569, 578 (2d Cir. 2016). On a motion to dismiss, a qualified immunity defense "'faces a formidable hurdle ...' and is usually not successful." Field Day, LLC v. Cty. of Suffolk, 463 F.3d 167, 191–92 (2d Cir.2006) (quoting McKenna v. Wright, 386 F.3d 432, 434 (2d Cir.2004)).

McMahon argues that there was no clearly established right for Pulizotto to attack McMahon's integrity and competence, and it was reasonable for her to believe her acts did not violate plaintiff's rights because her interest in the effective administration of the courthouse outweighed Pulizotto's rights. (Opp. Br. at 21; Doc 77 (citing Lynch, 811 F.3d at 579-81).) As stated above, reporting ethical misconduct within the judiciary to independent investigators as a "right to petition for a redress or grievances" is "among the most precious of the liberties safeguarded by the Bill of Rights." United Mine Workers, 389 U.S. at 222. Based solely on the allegations of the complaint, McMahon has not made out the defense of qualified immunity as a matter of law. Field Day, 463 F.3d at 192; see Higginbotham v. City of New York, 105 F. Supp. 3d 369, 375 (S.D.N.Y. 2015) (rejecting claim for qualified immunity on a motion to dismiss).

McMahon's motion to dismiss will be granted as to claims 1 and 2 of the Complaint alleging adverse action of harassment on September 5 and 7, granted as to claim 8, and denied as to claim 4 of the Complaint alleging adverse action of Pulizotto's job transfer.

B. <u>Unlawful Seizure of Pulizotto's Person and Vehicle (Claim 5)</u>

Pulizotto alleges that McMahon violated his Fourth Amendment rights to be free of illegal seizure when she permitted Quirk to restrain and seize him while in his vehicle outside the courthouse on September 7, 2017. (Compl. ¶¶315-18.) For reasons stated above, this claim will be dismissed. The Complaint does not allege that McMahon knew of the demonstrations in

the parking lot or had any involvement with the seizure of Pulizotto's vehicle. It states in a conclusory fashion that McMahon "encourag[ed] retaliatory actions in general, encourag[ed] . . . retaliatory actions in advance, and/or ratif[ied] these and other actions after-the-fact," (id. ¶316) and that she along with four other defendants at an unspecified date "communicated to" Quirk and NYSCOA members "that they will not be . . . interfered with" while "engag[ing] in conduct that was likely to endanger the life, liberty and property of Pulizotto," (id. ¶317; see id. ¶243.)[10] These conclusory allegations, unmoored to the actual conduct causing injury, do not plausibly allege a claim for relief against McMahon. Ciambriello, 292 F.3d at 324.

### C. Violation of Pulizotto's Substantive Due Process Rights (Claim 6)

Pulizotto alleges that McMahon violated his substantive due process rights and rights to equal protection under the Fifth and Fourteenth Amendments by "affirmatively and passively encourag[ing]" other court officers and members of the NYSCOA to harass him on September 5 and 7, 2017. The alleged harassment included making threats to contact Pulizotto's father, threats to revoke Pulizotto's membership in the Fraternal Order of Police, trapping Pulizotto in his car and filming him while inside, inflating a rat at the courthouse with Pulizotto's name on it, and contacting media outlets to publish pictures of the rat.

First, for the reasons stated above with respect to claims 1 and 2, see supra Discussion Section I.A.2, the Complaint fails to plausibly allege McMahon's personal involvement in the alleged harassment on September 5 and 7, 2017. See Provost, 262 F.3d at 154 (personal involvement is required to state a claim for section 1983 violations).

---

[10] The identical conclusory statement in the fact section of the Complaint omits McMahon entirely. (See Compl. ¶268.)

Second, even if Pulizotto could establish McMahon's personal involvement, any alleged Constitutional violations would not be actionable as a substantive due process claim or an Equal Protection Clause claim. "[W]here another provision of the Constitution 'provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claims under that explicit provision and 'not the more generalized notion of substantive due process.'" Kia P. v. McIntyre, 235 F.3d 749, 757-58 (2d Cir. 2000) (quoting Conn v. Gabbert, 526 U.S. 286, 293 (1999)). The underlying actions alleged to be substantive due process violations are the same as those alleged to be First Amendment retaliation violations and are "subsumed in [the] more particularized allegations" of claims 1 and 2. Velez v. Levy, 401 F.3d 75, 94 (2d Cir. 2005).

As for the Equal Protection Clause claim, because claim 6 does not allege that any of the argued Constitutional violations resulted from his membership in a protected class or group, he asserts a "class of one" claim. Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (discussing equal protection allegations for a class of one). But class of one claims "ha[ve] no application in the public employment context." Engquist v. Or. Dep't of Agric., 553 U.S. 591, 607 (2008); see Hu v. City of New York, 927 F.3d 81, 95 (2d Cir. 2019) ("Engquist . . . barred public employees from bringing Olech claims against their government employers.")

Pulizotto argues McMahon may be held liable for substantive due process violations based on a "state-created danger" theory. "The affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence." Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 429 (2d Cir. 2009). The Second Circuit has upheld the state-created danger doctrine where officials explicitly granted "prearranged official sanction of privately inflicted

injury," id. at 428, or implicitly gave official sanction by "repeated, sustained inaction," id. (citing Pena v. DePrisco, 432 F.3d 98, 111 (2d Cir. 2005)).  For example, in Pena family members of pedestrians killed by an off-duty drunk police officer brought substantive due process claims against, among others, individual officers.  The Second Circuit held plaintiffs had stated a cause of action based on implicit sanction because plaintiffs alleged that fellow police officers "condoned" the off-duty officer's behavior, "invited" the officer to drive after drinking, and "encouraged" him to "excessively drink alcohol while on and off-duty."  432 F.3d at 110-11.

Pulizotto has not plead allegations sufficient to sustain a cause of action based on a state-created danger theory against McMahon.  There is no allegation in the Complaint that McMahon gave explicit sanction to anyone to harass Pulizotto.  And unlike in Okin or Pena, the allegations of implicit sanction here are conclusory.  The only allegation specific to McMahon is that McMahon "[a]s a judicial supervisor . . . intentionally permitted Quirk and his accomplices to openly and publicly intimidate, retaliate and threaten Pulizotto and others at the courthouse on September 5, 2017 and September 7, 2017."  (Compl. ¶243.)  Beyond conclusory assertions, Pulizotto has not alleged any specific acts by McMahon or foreknowledge of misconduct followed by conscious inaction that would rise to a level of a substantive due process violation. Pena, 432 F.3d at 110; see Chambers v. N. Rockland Cent. Sch. Dist., 815 F. Supp. 2d 753, 767 (S.D.N.Y. 2011) (dismissing state-created danger claims that lacked any evidence that state actor "by his alleged non-responsiveness, *communicated*, even implicitly," to private actors).[11]  Legal labels aside, the Complaint alleges nothing more than that McMahon shared with Quirk an animus towards Pulizotto and that because she was Administrative Judge, she necessarily would

---

[11] Pulizotto's "[a]lternative[]" argument that McMahon may be held liable based on acting with "willful disregard of the obvious risks" to Pulizotto, (Opp. Br. at 30; Doc 83 (quoting Okin, 577 F.3d at 432)), addresses the state of mind requirement for a substantive due process violation and does not raise a separate legal theory.  See Okin, 577 F.3d at 431.

- 24 -

have had foreknowledge of the plans of Quirk and other court officers to harass Pulizotto but did nothing to stop them. The claim is premised upon conclusory allegations, devoid of factual heft, and draws implausible inferences as to McMahon's knowledge. Claim 6 will be dismissed.

        D.  <u>Section 1985(3) Conspiracy Claim (Claim 7)</u>

        Pulizotto alleges that McMahon conspired with another New York State Court Officer, Steven Panella, and others to deprive Court Officer SV of review of her workplace complaints based on racial discrimination and a hostile workplace environment. "A conspiracy claim under Section 1985(3) requires a plaintiff to allege: 1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws . . . ; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United states." <u>Dolan v. Connolly</u>, 794 F.3d 290, 296 (2d Cir. 2015) (internal quotation marks and citation omitted). The conspiracy must be motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus." <u>Cine SK8, Inc. v. Town of Henrietta</u>, 507 F.3d 778, 791 (2d Cir. 2007).

        McMahon raises an issue of Pulizotto's standing to assert a section 1985 claim for a conspiracy to deprive a third-party of her rights. Pulizotto does not allege that McMahon conspired to deny him equal protection because of his race or class status. He alleges that he has third party standing to bring claims on behalf of SV because the conspiracy deprived SV of her rights to communicate and file a workplace complaint based on discrimination and that he has a "concrete interest" in vindicating SV's rights. (Compl. ¶¶336, 338.) To the extent the Complaint alleges he suffered injury as a result of the conspiracy against SV, (<u>id</u>. ¶339), there is

also a question of whether Pulizotto has standing in his own right to bring a claim under section 1985(3).

It appears that the Second Circuit has not articulated a test for section 1985(3) standing.  See Griffin-Nolan v. Providence Wash. Ins. Co., 504 cv 1453 (FSJ)(GJD), 2005 WL 146024, at *9 n.8 (N.D.N.Y. June 20, 2005) (recognizing the lack of Second Circuit guidance and surveying conflicting case law).  The Court need not determine what test for standing applies in this case because even if Pulizotto had standing to bring a section 1985(3) conspiracy claim on behalf of SV or as an injured party himself, his claim would be dismissed.  The Complaint alleges that McMahon and Panella conspired to quash SV's complaint related to her supervisor's race and gender discrimination in 2016.  (Compl. ¶¶117-20, 333-35.)[12]  But the Complaint does not plausibly allege that this conspiracy was motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus."  Cine SK8, 507 F.3d at 791.  The only reason alleged for why McMahon asked Pulizotto not to pursue SV's complaint is that she did not want to "make any waves" before a fellow judge, who was also in a supervisory role to SV, received her reappointment to Family Court.  (Compl. ¶¶120, 337.)  This comment does not plausibly support a race-based conspiracy.

The Complaint also states that McMahon and Panella conspired to cover up an incident in which Panella's girlfriend made a racist remark to SV at a holiday party in 2013.  (Compl. ¶¶64-65, 122, 335.)  The Complaint does not provide any "factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve

---

[12] While the Complaint contains additional allegations of SV's grievances, see, e.g., Compl. ¶¶194-95 (alleging in May 2017 SV complained about her supervisor's racist conduct during a talk), it does not allege that McMahon or Panella conspired to deprive SV or Pulizotto of rights with respect to these complaints.

the unlawful end." <u>Webb v. Goord</u>, 340 F.3d 105, 110 (2d Cir. 2003) (quotation and citation omitted).[13]

Finally, the Complaint does not plausibly allege that Pulizotto's transfer or harassment in the courthouse parking lot were acts taken in furtherance of a conspiracy to quash SV's Constitutional rights. <u>Dolan</u>, 794 F.3d at 296. There is nothing in the Complaint tying Pulizotto's initial investigations into SV's complaints in February 2016 to his transfer and harassment in September 2017. For these reasons, Claim 7 will be dismissed.

### E. NYSHRL Claims Based on Sexual Orientation (Claims 9, 10)

Claims 9 and 10 allege McMahon created a hostile work environment for Pulizotto and discriminatorily transferred him based on his sexual orientation in violation of the NYSHRL. Under the NYSHRL, discrimination by virtue of a hostile working environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Forrest v. Jewish Guild for the Blind</u>, 3 N.Y.3d 295, 310 (2004). A determination of hostile work environment is based on the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993). A plaintiff must

---

[13] To the extent the claim is brought on behalf of SV for actions to deprive her of rights in or around 2013, <u>see</u> Compl. ¶¶64-65, the claim is barred because for civil conspiracies including conspiracies to violate an individual's civil rights "the cause of action accrues and the statute of limitations beings to run from the time of commission of the overt act alleged to have caused damages." <u>Allen v. Mattingly</u>, 10 cv 0667, 2011 WL 1261103, at *11 (E.D.N.Y. Mar. 29, 2011), <u>aff'd</u>, 478 F. App'x 712 (2d Cir. 2012) (quoting <u>Chodos v. Fed. Bureau of Investigation</u>, 559 F. Supp. 69, 74 (S.D.N.Y. 1982), <u>aff'd</u>, 697 F.2d 289 (2d Cir. 1982)). The statute of limitations for civil conspiracies under section 1985 is three years. <u>See Paige v. Police Dep't of City of Schenectady</u>, 264 F.3d 197, 199 n.2 (2d Cir. 2001); Doc 1 (Complaint filed in December 2017).

demonstrate that she "found the environment offensive" and "that a reasonable person also would have." Bermudez v. City of New York, 783 F. Supp. 2d 560, 578 (S.D.N.Y. 2011).

Pulizotto fails to plausibly allege behavior by McMahon that is "so extraordinarily severe . . . to have altered the conditions of [his] working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000). Most of the allegations of hostile working environment are directed at actions by non-party Quirk. Between May 2015 and September 2017, the time period discussed in the Complaint, Pulizotto alleges four acts by McMahon giving rise to a hostile work environment. "On more than one occasion," McMahon made Pulizotto bring her coffee when her secretary was absent. (Compl. ¶125.) Pulizotto states in a conclusory fashion that his "sexual orientation was a determinative or motivating factor" in McMahon's coffee order. (Id. ¶126.) Without more, this bare assertion does not give rise to a plausible inference of discriminatory intent. Lenart v. Coach, Inc., 131 F. Supp. 3d 61, 68 (S.D.N.Y. 2015). The subjective belief of sexual orientation discrimination, "however strongly felt – is insufficient to satisfy his burden at the pleading stage." Doe v. Columbia Univ., 101 F. Supp. 3d 356, 371 (S.D.N.Y. 2015).

McMahon allegedly was upset that Pulizotto did not thank her during a speech at a Gay Pride parade. (Compl. ¶145.) This does not allege "discriminatory intimidation, ridicule, [or] insult." Redd v. N.Y. Div. of Parole, 678 F.3d 166, 175 (2d Cir. 2012).

Quirk is alleged to have falsely accused Pulizotto in private in November 2015 of having an affair with a male coworker and seeking sexual favors in the locker room during a conversation in which Quirk also threatened that Pulizotto was "'halfway out the door' regarding his employment" and asked Pulizotto "[w]ho are you to say that [Justice McMahon] should leave Richmond County for ethical reasons." (Compl. ¶¶95-96.) After this conversation, Pulizotto

returned to his office and met with McMahon, who "rolled her eyes, and in an angry tone bellow[ed]: 'Do you understand?'" (Id. ¶98.)  While alleging an offensive act on Quirk's part, it is not as plausible to infer McMahon knew of the sexual comments.

   Pulizotto's most significant allegation in support of his hostile work environment claim is that during a dinner in February 2016 McMahon "[o]penly mocked Pulizotto's sexual orientation, including but not limited to speaking to Pulizotto in an exaggerated, effeminate tone while using homophobic, stereotypical hand gestures, including limp writs." (Compl. ¶124.) Accepting that this conduct has discriminatory intent, and even accepting the November 2015 incident as an act with McMahon's knowledge, Pulizotto has not shown that these were more than "isolated acts," which "do not meet the threshold of severity or pervasiveness." Alfano v. Costello, 294 F.3d 365, 373-74 (2d Cir. 2002) (citing cases); see Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003) ("As a general rule, incidents must be more than episodic . . . ." (quotations omitted)); Brown v. Coach Stores, Inc., 163 F.3d 706, 713 (2d Cir. 1998) (similar). Considering the totality of the circumstances including the frequency of conduct its severity, physical impact, and alleged impact on Pulizotto's employment, Pulizotto has not alleged enough to support a claim for a hostile work environment.

   Claim 10 alleges discriminatory job transfer based on sexual orientation. NYSHRL discrimination claims are analyzed under the same framework as federal Title VII cases.  See Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 107 n.10 (2d Cir. 2011). Plaintiff must allege (1) he was a member of a "protected class," (2) he was qualified for the position, (3) he experienced "adverse employment action," and (4) such action occurred under circumstances giving rise to "an inference of discrimination." Beyer v. City of Nassau, 524 F.3d

160, 163 (2d Cir. 2008) (internal quotations omitted). Adverse employment action may include

demotion. Leibowitz v. Cornell Univ., 584 F.3d 487, 499 (2d Cir. 2009).

At the motion to dismiss stage, a complaint must "at a minimum assert

nonconclusory factual matter sufficient to 'nudge its claims across the line from conceivable to

plausible.'" E.E.O.C. v. Port Auth. Of N.Y. & N.J., 768 F.3d 247, 254 (2d Cir. 2014) (quoting

Iqbal, 556 U.S. at 680) (alterations omitted). Causation may be alleged indirectly, "by showing

that the protected activity was followed closely by discriminatory treatment, or through other

circumstantial evidence such as disparate treatment of fellow employees who engaged in similar

conduct," or directly "through evidence of retaliatory animus directed against the plaintiff by the

defendant." Hicks v. Baines, 593 F.3d 159, 170 (2d Cir. 2010) (quotations omitted). "Naked

assertions of . . . discrimination without any specific factual allegation of a causal link between

the defendants' conduct and the plaintiff's protected characteristic are too conclusory to

withstand a motion to dismiss." Johnson v. Morrison & Forester LLP, 14 cv 428 (JMF), 2015

WL 845723, at *3 (S.D.N.Y. Feb. 26, 2015) (quotations omitted).

Pulizotto alleges that his sexual orientation was "a determinative factor" in the

decision to transfer him to a new position. (Compl. ¶366.) McMahon's plausibly alleged

discriminatory animus toward Pulizotto, her homophobic gesturing at a dinner, occurred in

February 2016. (Id. ¶124.)[14] The year and a half span between events does not create an

inference of a causal connection. "Action taken . . . 20 months later suggests, by itself, no

causality at all." Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 274 (2001); see Bucalo v.

Shelter Island Union Free Sch. Dist., 691 F.3d 119, 131 (2d Cir. 2012) ("[C]ourts in this circuit

have typically measured that gap as a matter of months, not years."). Pulizotto acknowledges

---

[14] Quirk's statement regarding Pulizotto's sexual acts after which McMahon stated "Do you understand?" occurred in November 2015. (Compl. ¶96.)

non-discriminatory (albeit allegedly retaliatory) reasons to account for his transfer, namely, his reports of McMahon's misconduct to investigative bodies and tape recordings. The Complaint contains no allegations that McMahon's "perceptions of his job performance were animated by discriminatory animus" or that "co-workers with similar job skills, but without his protected characteristics were perceived as more effective employees." <u>Johnson</u>, 2015 WL 845723, at *5. For these reasons, claims 9 and 10 will be dismissed.

      F.   <u>NYSHRL Claims Based on Retaliatory Harassment (Claims 11, 12)</u>

      Like discrimination claims, retaliation claims under the NYSHRL are analyzed in identical fashion to Title VII claims. <u>Rojas</u>, 660 F.3d at 107 n.10. Pulizotto must plausibly allege that (1) "defendants discriminated—or took an adverse employment action—against him," (2) "because he has opposed any unlawful employment practice." <u>Vega v. Hempstead Union Free Sch. Dist.</u>, 801 F.3d 72, 90 (2d Cir. 2015) (quotations omitted). Retaliation must be a "but for" cause of the adverse action, that is, plaintiff must show that "the adverse action would not have occurred in the absence of the retaliatory motive." <u>Zann Kwan v. Andalex Grp. LLC</u>, 737 F.3d 834, 846 (2d Cir. 2013) (discussing <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 570 U.S. 338 (2013)).

      Pulizotto alleges he was transferred and harassed in the parking lot in retaliation for objecting to the discrimination against SV. (Compl. ¶¶372-81 (retaliatory harassment); <u>id</u>. ¶¶382-86 (retaliatory transfer)).

      McMahon's involvement in the alleged retaliatory harassment has already been discussed above with regard to claims 1 and 2 and determined to be insufficient to state a claim for relief. McMahon's remaining alleged retaliatory harassment under claims 11 and 12 consists of "defaming and impugning Pulizotto's character and ability as Chief Clerk to other judges in

Richmond County" by calling for a vote of "no confidence" in Pulizotto on September 5, 2017 and transferring him to a position in the court administration headquarters. (<u>Id</u>. ¶¶239, 373, 378.) For the reasons stated in claim 7, Pulizotto has not plausibly alleged that McMahon's "no confidence" vote or role in transferring Pulizotto in September 2017 would not have occurred but for a motive to retaliate against Pulizotto based on his desire to investigate SV's complaints in early 2016. The allegations of the Complaint belie this theory. On September 5, 2017, McMahon called an emergency judges meeting to announce allegations against her,[15] accused Pulizotto of taping conversations with employees, and stated she would be vindicated. (<u>Id</u>. ¶239.) Pulizotto has failed to state a claim for retaliatory harassment against McMahon based on his objections to discrimination against SV. Claims 11 and 12 will be dismissed.

## II. <u>Kantor, Mikos, and the NYSCOA's Motion to Dismiss</u>

Pulizotto pleads claims 1, 2, 5, and 6 (violations of 42 U.S.C. § 1983) against Kantor, Mikos, and the NYSCOA, and claims 9 and 11 (violations of New York State Human Rights Law) against the NYSCOA.

### A. <u>The Counts Against Mikos and Kantor Fail to Plead State Action</u>

Pulizotto pleads claims 1, 2, 5, and 6 (violations of 42 U.S.C. § 1983) against Kantor and Mikos. Mikos and Kantor are sued in their individual capacities, in their official

---

[15] It is not alleged that McMahon knew claims of her suppression of SV's complaints had been disclosed to investigative bodies. Rather, the assertions plausibly suggest McMahon's discussion of allegations against her related to allegations of improper interference in criminal matters. <u>See</u> Doc 14 Ex. 2 (McMahon stating in August 2017 "this investigation is most likely political and ultimately a plot against her husband" and mentioning "interference with the Grand Jury and Part N"); Compl. ¶¶203-04 (similar)). Pulizotto alleges he told the Office of the United States Attorney of the SV complaint suppression, Compl. ¶151, but does not allege he told the IG of the suppression, <u>id</u>. ¶180 (reporting to the IG "numerous activities" and noting that Pulizotto had reported "many of those" to the Office of the United States Attorney). The date by which McMahon knew of Pulizotto's report to the United States Attorney is not alleged (<u>Id</u>. ¶181.)

capacities as members of the NYSCOA, and in their official capacities as New York State Court Officers. (Id. ¶¶30, 32.)[16]

To state a claim under section 1983, a plaintiff must establish "(1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." Annis v. Cty. of Westchester, 136 F.3d 239, 245 (2d Cir. 1998). Actions are alleged under color of state law where they "were made as a state actor, or where the person acts in his official capacity or while exercising his responsibilities pursuant to state law." Montero, 890 F.3d at 402 (internal quotation marks and citation omitted). "[T]here is no bright line test for distinguishing 'personal pursuits' from activities taken under color of law." Pitchell v. Calan, 13 F.3d 545, 548 (2d Cir. 1994).

"Actions taken by municipal employees solely in their capacity as union leaders or members are not cognizable under [section] 1983." Cobbs v. City of Newburgh-City Council, 546 F. App'x 34, 36 (2d Cir. 2013) (citing Kern v. City of Rochester, 93 F.3d 38, 43 (2d Cir. 1996)); see Ciambriello, 292 F.3d at 323 ("Labor unions . . . generally are not state actors . . . ."); Jourdain v. Serv. Empls. Int'l Union Local 1199, 09 cv 1942 (AKH), 2010 WL 3069965, at *6 (S.D.N.Y. July 28, 2010) ("[A] Union or its officials . . . generally are not amenable to suit under [section] 1983 because they are not state actors." (internal quotations and citation omitted)).

Pulizotto does not contest that Mikos and Kantor may not be held liable as members of the NYSCOA. Instead, he argues they acted under color of state law as court officers. He alleges that they participated in harassment outside of the courthouse, their place of

---

[16] "In an official capacity suit, 'the real party in interest . . . is the governmental entity and not the named official.'" Tanvir v. Tanzin, 894 F.3d 449, 459 (2d Cir. 2018) (quoting Hafer v. Melo, 502 U.S. 21, 25 (1991)).

employment, and they were given a "green light" to continue their harassment by other state employees.  (Opp. Br. at 41-42; Doc 83 (citing Compl. ¶¶230-31, 245-46, 255, 259, 263, 268.))

Pulizotto has not plausibly alleged Mikos and Kantor acted under color of state law even though they held positions as courts officers.  The Complaint explicitly states that the court officers "other than . . . Mikos and Kantor . . . were in uniform and on-duty."  (Compl. ¶230.)  Mikos and Kantor's alleged actions of cursing and threatening Pulizotto on September 5, 2017 and inflating the rat were taken outside of the workplace. (Id. ¶¶231, 259.)  Pulizotto's own pleading belies his argument that inflating the rat was an action taken as part of official job responsibilities.  (See Doc 83 at 49 n.3 (citing Mikada Grp., LLC v. T.G. Nickel & Assocs., LLC, 13 cv 8259, 2014 WL 7323420, at *1 (S.D.N.Y. Dec. 19, 2014) for the proposition that inflatable rats are traditional symbols of labor unrest).)  The Complaint does not specify where Kantor and Mikos gave quotes to the media, the only other act alleged against them specifically. (Compl. ¶269.)  The Complaint alleges that three state employees discussed permitting Quirk and his accomplices, which would include Mikos and Kantor, to continue their acts of harassment. (Id. ¶246.)  It is not alleged, however, that Kantor or Mikos knew of this conversation or acted pursuant to it.  It is alleged that at some unknown point in time other state employees assured Mikos and Kantor that they would not be arrested or disciplined for their actions.  (Id. ¶268.)  This is similarly not sufficient to plausibly allege action or exercise of responsibilities pursuant to state law.

Pulizotto further argues Kantor and Mikos may be held liable under section 1983 because they were acting in conspiracy or joint action with McMahon, a state actor.  The Complaint does not plausibly allege a section 1983 conspiracy between McMahon and Mikos or Kantor.  The Complaint makes no reference to Mikos and Kantor having any communication

with McMahon. Pulizotto's section 1983 conspiracy or joint action claim as to Mikos and

Kantor is based on the same alleged conspiracy as that between McMahon and Quirk that was

explained above. For the same reasons as stated above, McMahon's involvement is not plausibly

alleged.

    B.   <u>The Counts Against NYSCOA Fail to State a Plausible Claim for Relief</u>

    1.   <u>Section 1983 Claims Against NYSCOA</u>

        Pulizotto argues the NYSCOA may be liable for acting in concert with McMahon,

a state actor. Pulizotto's argument is based on the same facts as those alleged with respect to

Mikos and Kantor's actions in concert with state actors. For the reasons discussed with respect

to Mikos and Kantor, this argument is unavailing. Pulizotto also argues that the NYSCOA may

be held liable based on Kantor, Mikos, and others' unlawful acts in their official capacities as

NYSCOA members. The Court disagrees for the reasons stated above. <u>See</u> <u>Cobbs</u>, 546 F.

App'x at 36; <u>Kern</u>, 93 F.3d at 43.

    2.   <u>NYSHRL Claims Against NYSCOA</u>[17]

        The Complaint alleges harassment based on sexual orientation and retaliatory

harassment in violation of the NYSHRL against the NYSCOA. (Compl. ¶¶360, 375.) NYSCOA

argues that it may not be held liable under the NYSHRL because plaintiff does not allege he was

represented by the NYSCOA or otherwise had any relationship with the NYSCOA.

        The NYSHRL applies to acts committed against employees. <u>Moss v. Stinnes</u>

<u>Corp.</u>, 169 F.3d 784, 785 (2d Cir. 1999); <u>Rich v. Coopervision, Inc.</u>, 198 A.D.2d 860, 861 (4th

Dep't 1993). Unions may be sued under the NYSHRL as an employer, labor organization, or

---

[17] In his Opposition Brief, Pulizotto argues for the first time that Mikos and Kantor may be personally liable for violations under the NYSHRL. (Opp. Br. at 49; Doc 83.) "[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." <u>Jordan v. Chase Manhattan Bank</u>, 91 F. Supp. 3d 491, 500 (S.D.N.Y. 2015). The Court declines to consider these arguments.

operator of an apprenticeship program. See Mohr v. United Cement Mason's Union Local 780, 15 cv 4581 (AMD)(CP), 2017 WL 1187690, at *3 (E.D.N.Y. Mar. 30, 2017) (citing N.Y. Exec. Law § 296(1)(a); (1)(c); and (1-a)). Pulizotto makes no allegation that he was ever employed by NYSCOA or a member of an apprenticeship program. He is not alleging claims against NYSCOA as a labor organization because he makes no allegations regarding the NYSCOA's capacity as a collective bargaining representative. See Figueroa v. Foster, 864 F.3d 222, 224 (2d Cir. 2017) (distinguishing claims brought against unions).[18] His state law claims against NYSCOA (counts 9, 11) will be dismissed.

CONCLUSION

For the foregoing reasons, McMahon's motion to dismiss is DENIED as to Claim 4 and otherwise GRANTED. Mikos, Kantor, and the NYSCOA's motion to dismiss is GRANTED.

The Clerk is directed to terminate the motions (Docs 75, 78.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
        August 23, 2019

---

[18] While not raised by the parties, the Court notes that NYSHRL extended protections against sexual harassment to certain non-employees such as contractors or persons providing services pursuant to a contract in the workplace effective April 12, 2018. N.Y. Exec. Law § 296-d. ("It shall be an unlawful discriminatory practice for an employer to permit sexual harassment of non-employees in its workplace. . . . "). Pulizotto does not contend that he meets the requirements of section 296-d.